846 So.2d 697 (2003)
STATE of Louisiana
v.
Amos John CHAUVIN.
No. 2002-K-1188.
Supreme Court of Louisiana.
May 20, 2003.
*698 Richard P. Ieyoub, Attorney General, Joseph L. Waitz, Jr., District Attorney, Herbert W. Barnes, Jr., Ellen M. Daigle, Counsel for Applicant.
Bertha M. Hillman, HILLMAN, SOIGNET & RATHLE; Counsel for Respondent.
KNOLL, Justice.
This criminal case concerns the admissibility of expert testimony with regard to Post Traumatic Stress Disorder (PTSD) of a sexually abused victim. After a jury trial, defendant was convicted of two counts of indecent behavior with juveniles. On appeal, his convictions were reversed and the case remanded to the trial court for a new trial. The majority of the court of appeal held that the trial court erroneously admitted the testimony of the State's expert witness by failing to apply the factors enunciated in Daubert v. Merrell Dow Pharmaceuticals, Inc.,[1] and State v. Foret,[2] to test the reliability of the theory of post-traumatic stress disorder in the diagnosis of sexual abuse. We granted the State's application for a writ of certiorari to consider the admissibility of this type of expert testimony as substantive evidence bearing on the credibility of the victim's testimony and the question of the accused's guilt or innocence. State v. Chauvin, 02-K-1188 (La.11/27/02), 831 So.2d 268.

FACTS AND PROCEDURAL HISTORY
On June 20, 1999, A. C.,[3] who was fifteen years old,[4] attended a Father's Day gathering at her friend A. L.'s family home. A.L. was fourteen years old.[5] A.C. testified *699 that A.L. was seated using the computer in the living room, and A.C. was standing behind her. A.L.'s parents and A.L.'s aunt were outside. The defendant, who was the fiancé of A.L.'s aunt, was also present at A.L.'s family home. A.C. testified that while she was standing behind A.L., watching A.L. use the computer, the defendant came into the room, knelt next to A.C. on her right side and behind A.L., and touched her behind, put his hand inside her panties and put one of his fingers in her vagina. The defendant then left the room, but returned and repeated these actions. A.C. also testified that the defendant French-kissed her on that same day in the living room, when no one was present. She further testified that at a prior time at A.L.'s house, when passing the defendant in the hallway, the defendant had touched her breasts through her clothing.
Later on Father's Day, A.C. accompanied A.L. and A.L.'s parents to have supper at A.L.'s grandmother house. A.L.'s aunt and the defendant were also present. A.L. testified that at her grandmother's house, the defendant asked for a good-by hug and kiss. A.L. was surprised when the defendant kissed her by sticking his tongue in her mouth. The defendant was 34 years old at the time of these incidents.
On this same day, after these incidents, A.C. told A.L. what defendant had done to her. A.L. also told A.C. what defendant had done to her. The next day, A.L. told A.C.'s older sister, Mandy, about these incidents. Detective Ashli Richardson of the Houma Police Department testified that these incidents were reported to the police department approximately four days after they occurred. Detective Dawn Gautreaux testified that a report was made to the Terrebonne Sheriff's Office by the victims on July 26, 1999.
At trial, over the objection of the defendant, the State was allowed to introduce the expert testimony of Renee Thompson Ring, a licensed clinical social worker.[6] The State wanted to use Ms. Ring's expert opinion to establish that A.C.'s clinical symptoms were consistent with a sexual abuse victim; in other words, to use her testimony as substantive evidence of sexual abuse. The trial court allowed Ms. Ring to testify as an expert without conducting a Daubert hearing to test the reliability of PTSD in the diagnosis of sexual abuse.
Ms. Ring testified before the jury that she saw A.C. as a patient at "The Haven," "a safe place for persons of sexual assault and domestic violence to come in for individual counseling or group counseling...." She treated A.C. clinically for emotional problems. Based upon objective and subjective symptomatology, she diagnosed A.C. with PTSD. Ms. Ring's testimony described PTSD in layman's terms and the symptomatology that she saw that led her to diagnose A.C. as suffering from PTSD.[7] *700 Ms. Ring offered her expert opinion in response to the following questions from the State:
Q. Okay. Let me ask you this. The clinical findings, both subjective and objective, that you observed in regard to [A.C.] when you treated her for these problems, were those consistent with a child who had been sexually abused?
A. Yes, the symptoms were that of post-traumatic stress.
Q. Ma'am, I got a question just in general for you. Is there any way that you can predict, based on your experience and education, how a child might react to sexual abuse?
A. I mean just by the criteria of post-traumatic stress you don't know exactly what symptoms they might have, but there's a general knowledge that they could have this, they could have this, they could have this.
On cross-examination, Ms. Ring was questioned as to whether these same symptoms might be seen in a child that was having problems other than sexual abuse. Ms. Ring responded that one would rule out any other reasons for the disorder and that is how one would make a diagnosis. Also on cross-examination, Ms. Ring acknowledged that the diagnosis was her opinion, and also acknowledged that experts make mistakes.
The jury found the defendant guilty on both counts of indecent behavior with a juvenile. The defendant filed motions for a new trial and for a post-verdict judgment of acquittal, which were both denied. The court of appeal, in a two to one decision, reversed the convictions and remanded for a new trial, finding the trial court abdicated its responsibility to "act as a gatekeeper," by failing to apply the Daubert and Foret factors to test the reliability of the theory of PTSD in the diagnosis of sexual abuse, which erroneously admitted expert testimony affected substantial rights of the accused. State v. Chauvin, 01-2000 (La. App. 1 Cir. 3/28/02), 818 So.2d 323 (unpublished). We granted the State's writ to further study this problematic issue and after a careful review, we agree with the court of appeal majority and affirm.

DISCUSSION
La.Code Evid. art. 702 sets forth the general rule governing the admissibility of expert testimony in Louisiana:
If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.
In Foret, we adopted the test set forth in Daubert, which "set forth a means for determining reliability of expert scientific testimony and answered many questions as to proper standards for admissibility of expert testimony." Foret, 628 So.2d at 1121.
The Daubert court replaced the test that had been used for admissibility of expert scientific testimony. The former test was based on a "short, citation-free 1928(sic) decision" of the District of Columbia Court of Appeals, Frye v. United States, 54 App. D.C. 46, 293 F. 1013 (1923). The court replaced Frye with a new standard that requires the trial court to act in a "gatekeeping" function to "ensure that any and all scientific testimony or evidence admitted *701 is not only relevant, but reliable." Daubert, 509 U.S. at 589, 113 S.Ct. at 2795.
To assist the trial courts in their preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and can properly be applied to the facts at issue, the Supreme Court suggested the following general observations are appropriate: 1) whether the theory or technique can be and has been tested; 2) whether the theory or technique has been subjected to peer review and publication; 3) the known or potential rate of error; and 4) whether the methodology is generally accepted by the relevant scientific community. Daubert, 509 U.S. at 592-594, 113 S.Ct. at 2796-2797. In Foret, we adopted these "observations" as a helpful guide for our lower courts in considering this difficult issue. Foret, 628 So.2d at 1123.
The similarity between La.Code Evid. art. 702 and its federal counterpart, along with our case State v. Catanese, 368 So.2d 975 (La.1979), which had already provided similar guidelines for the admission of scientific evidence, persuaded this Court to adopt Daubert's requirement that, in order for technical or scientific expert testimony to be admissible under La.Code Evid. art. 702, the scientific evidence must rise to a threshold level of reliability. State v. Quatrevingt, 93-1644, p. 11-12 (La.2/28/96), 670 So.2d 197, 204.
In the matter before us, the majority of the court of appeal relied upon this Court's decision in Foret in finding that the trial court failed to perform its "gatekeeping" function by failing to apply the factors enunciated in Daubert and Foret to test the reliability of the theory of PTSD in the diagnosis of sexual abuse. The appellate majority determined that the State used Ms. Ring's testimony to establish that symptoms of PTSD were consistent with the symptoms of a child who had been sexually abused; that PTSD provided guidelines on what symptoms a child reacting to sexual abuse might have; and that A.C. was suffering from PTSD. Because Ms. Ring did not limit her information to explaining "superficially bizarre" reactions of A.C. and went beyond merely providing a scientific perspective from which the jury could evaluate A.C.'s testimony, the majority held admissibility of her testimony was erroneous. The appellate majority further found that this Foret violation was harmful error with regard to both counts. A.C.'s testimony was the most damaging evidence offered against defendant on count one. The inadmissible expert testimony served to unduly bolster A.C.'s testimony and, in all probability, made it more believable to the jury. Although A.L. was the victim named in count two, the court of appeal found that A.C.'s unduly bolstered testimony corrupted the entire trial. Therefore, finding the erroneously admitted testimony affected substantial rights of the accused and that the defendant timely objected to this testimony, the appellate majority reversed the convictions on both counts, remanding the matter to the trial court for a new trial.
The State argues that the testimony was not so unusual or complex as to require a Daubert hearing to test its reliability. Relying upon Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 152, 119 S.Ct. 1167, 1176, 143 L.Ed.2d 238 (1999),[8] the State *702 asserts that the determination of how to test an expert's reliability is in the trial judge's discretion. The record before us shows the trial court held a brief hearing before Ms. Ring testified. The State submits that the trial judge can use his or her own experience and knowledge after hearing briefly what the testimony will be to determine that the testimony is commonly accepted among professionals and thus is reliable and relevant. The State contends that this matter is distinguishable from Foret, because Ms. Ring did not testify that A.C. was a victim of sexual abuse nor did she testify as to A.C.'s credibility.[9]
The defendant counters the State's argument by stressing that the trial court is required to prevent undue emphasis from being placed upon expert testimony when no scientific basis for that testimony can be established. Defendant contends the trial court failed to apply the "observations" of Daubert and Foret. There was no testimony that Ms. Ring's technique had been subjected to peer review; there was no testimony as to the potential rate of error; and there was no testimony as to whether her methodology was generally accepted in the scientific community. Defendant argues the trial court failed to test the reliability, if any, of the theory of PTSD in the diagnosis of sexual abuse.
We must determine under the guidance established in Daubert, Kumho Tire and Foret, whether Ms. Ring's testimony was admissible, and if so, whether the trial court should have first conducted a Daubert hearing to test the reliability of PTSD and the diagnosis of sexual abuse. Ms. Ring's clinical diagnosis that A.C. had PTSD was introduced in the State's case-in-chief, for the specific purpose of showing A.C.'s symptoms and/or that her diagnosis were consistent with those of a child who has been sexually abused. The troubling issue raised by Ms. Ring's expert testimony is res nova before this Court. In resolving this issue, we have studied scholarly publications and jurisprudence of other states, as well as our own jurisprudence.
Balance of Competing Interests
We begin by noting that child sexual abuse cases are not easy to prosecute. Dara Loren Steele, Note, Expert Testimony: Seeking an Appropriate Admissibility Standard for Behavioral Science in Child Sexual Abuse Prosecutions, 48 Duke L.J. 933, 938 (1999). Child sexual abuse is difficult to prove because it most often occurs in private, often the perpetrator is a member of the victim's family, and physical evidence of the abuse is rare. Id. The problems with prosecuting child sexual abuse cases are increased by the fact that most children fail to report the abuse, and, if they do report, there is often a significant lapse in time between the actual occurrence and the ultimate reporting of the abusive incident by the child. Id., pp. 938-939. Even then, the child may not include details in her revelation and often children recant or alter their allegations of abuse. Id., p. 939.
Expert testimony can assist a trier of fact in understanding the significance of a child-witness's demeanor, inconsistent reports, delayed disclosure, reluctance to testify, and recantation. Veronica Serrato, Note, Expert Testimony in Child Sexual *703 Abuse Prosecutions: A Spectrum of Uses, 68 B.U. L.Rev. 155, 156 (1988). An expert witness can explain to jurors that a child-witness's seemingly abnormal behaviordelayed reporting, inconsistent statements, and recantationis in fact normal for children who have been sexually abused and can also dispel inaccurate perceptions held by jurors, allowing them to better assess a child-witness's testimony. Id. p. 163. Expert testimony becomes problematic when it infringes upon other interests: for example, when it is unduly prejudicial, when it invades the province of the jury, when it bolsters a child-witness's testimony, or when it leads to a "battle of the experts." Id. p. 156.
The admissibility vel non of this type of expert testimony requires a delicate balance of these competing interests. Our task in this case is to provide guidance to the lower courts that will assist them, on a case by case basis, to balance these competing interests when faced with this difficult issue.
Reliability of PTSD
With regard to testimony from mental health professionals, it is important to note the distinction between substantive evidence and evidence designed to rehabilitate witness credibility. 1 John E.B. Myers, Evidence in Child Abuse and Neglect Cases, § 5.1, p. 412 (3d ed.1997). Expert testimony in child sexual abuse litigation falls into two categories: (1) expert testimony offered as substantive proof that a child was sexually abused, and (2) expert testimony offered for the more limited purpose of rehabilitating a child's impeached credibility. Id., § 5.12, p. 459. Expert testimony offered as substantive evidence takes several forms, including testimony that in the expert's opinion, the child's symptoms are consistent with sexual abuse. Id., § 5.34, p. 527. When such testimony is offered by the prosecution, the purpose is to prove that abuse occurred.
The fourth edition of the Diagnostic and Statistical Manual of Mental Disorders (DSM-IV) of the American Psychiatric Association lists PTSD[10] as an anxiety disorder. *704 Myers, § 5.3 p. 423, citing American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 424 (4th ed.1994). The diagnosis was formally introduced into the psychiatric nomenclature in the third edition of the DSM published in 1980. Myers, § 5.3 p. 423, note 75 (citation omitted). According to the DSM:
The essential feature of Posttraumatic [sic] Stress Disorder is the development of characteristic symptoms following exposure to an extreme traumatic stressor involving direct personal experience of an event that involves actual or threatened death or serious injury, or other threat to one's physical integrity.... The person's response to the event must involve intense fear, helplessness, or horror (or in children, the response must involve disorganized or agitated behavior)....
Traumatic events that are experienced directly include ... violent personal assault (sexual assault, robbery, mugging).... For children, sexually traumatic events may include developmentally inappropriate sexual experiences without threatened or actual violence or injury. Id.

PTSD is sufficiently recognized in the medical, and particularly the psychiatric, community to be considered as the proper subject of expert testimony.
In many child sexual abuse prosecutions, prosecutors offer expert PTSD-based testimony that the child complainant's behavior is consistent with being sexually abused. Lisa Askowitz & Michael Graham, The Reliability of Expert Psychological Testimony in Child Sexual Abuse Prosecutions, 15 Cardozo L.Rev.2027, 2046 (1994). Because evidence of PTSD is admissible in other contexts, prosecutors of child sexual abuse cases might attempt to capitalize on PTSD's legacy of admissibility by offering testimony which refers explicitly to PTSD. Steele, p. 946. The expert explains the diagnostic category, and then matches the behavioral characteristics of the child with the PTSD criteria. Askowitz, p.2046. In its true form, testimony based on PTSD suggests only that sexual abuse may be the cause of the child's behavior, but it does not rule out other traumatic causes of the behavior. Id. PTSD assumes the presence of a stressor and then attaches a diagnosis to the child's reactions to it. Id. PTSD merely is a therapeutic tool; it is not designed to determine sexual abuse. Id. See also Steele, p. 946.
We recognize that expert testimony regarding PTSD has been admitted in various contexts in Louisiana courts. Held v. State Farm Ins. Co., 610 So.2d 1017, 1020 (La. Ct.App. 1 Cir.1992) (In plaintiff's tort suit against her father for sexual abuse, the combination of plaintiff's PTSD and the financial domination of her parents triggered the application of contra non valentem); State ex rel. B.J., 00-1434 (La. App.1 Cir. 7/27/00), 767 So.2d 869, 874 (In termination of parental rights matter, psychiatrist testified that he diagnosed two of the children as having PTSD); G.N.S. v. S.B.S., 35,348 (La.App. 2 Cir. 9/28/01), 796 So.2d 739, 746-747 (In matter concerning child custody, social worker and psychiatrist testified child suffered from PTSD). In a prosecution for aggravated rape, committed *705 when the victim was under the age of twelve, a clinical psychologist testified that the victim showed the clinical symptoms of PTSD, which was consistent with the trauma of being raped. State v. Bosley, 29,253 (La.App. 2 Cir. 4/2/97), 691 So.2d 347, 349. The defendant did not challenge the admissibility of this testimony, but challenged the sufficiency of the evidence to convict. In reviewing the evidence for sufficiency to convict, the appellate court found the jury was presented with a classic credibility contest. It found the evidence was legally sufficient to convince a rational fact finder beyond a reasonable doubt that defendant committed the aggravated rape before the victim's twelfth birthday. Id., 691 So.2d at 350-351. See also State v. Adkins, 31,300 (La. App. 2 Cir. 11/9/98), 721 So.2d 1090, 1095 (Testimony by minor alleged rape victims that defendant had raped and threatened to kill them, testimony by defendant's two nieces that defendant had attempted to touch them inappropriately and expert testimony revealing physical and emotional symptoms consistent with alleged molestation was sufficient to support convictions for forcible rape; that evidence included testimony from a psychiatrist that the victim suffers from PTSD as a result of the ordeal; the defendant did not challenge the admissibility of the expert testimony.)
Even though PTSD is a catalogued condition of the DSM, and has been admitted into evidence by our courts in various matters, there is no evidence in the record before us that the trial court performed its "gatekeeping" function of determining that the testimony of Ms. Ring was both relevant and reliable as substantive proof that sexual abuse occurred.
Several other state courts have considered the admissibility of expert testimony regarding PTSD in a criminal prosecution for child sexual abuse. Almost every court that has addressed this issue has concluded that PTSD evidence is admissible to explain a victim's behavior that is apparently inconsistent with having been sexually abused if the defense has made it an issue.[11] As to the more difficult issue of whether evidence of PTSD is admissible to prove sexual abuse, the courts are divided. Some jurisdictions allow PTSD testimony to show that the victim was sexually abused.[12] Other jurisdictions forbid PTSD testimony for the purpose of proving that sexual abuse in fact occurred.[13] In addition, some courts recognize that PTSD is founded upon good science, but conclude it will not assist the trier of fact to determine whether sexual abuse occurred because it is a therapeutic method that was not intended to be used as a forensic tool. See *706 State v. Cressey, 628 A.2d at 699; State v. Hall, 412 S.E.2d at 889.
The State of Maryland's highest court has considered the issue of whether expert testimony that the alleged victim was suffering from PTSD as a result of being sexually abused was admissible to prove that the sexual abuse occurred. See Hutton v. State, 339 Md. 480, 663 A.2d 1289 (1995). We find their analysis helpful and quote with approval their scholarly comments on this aspect of PTSD:
PTSD may be experienced by persons who have been in combat, natural disasters, automobile or airplane accidents, or raped, among other traumatic events. Smith, Post Traumatic Stress Disorder, 20 Trial 92 (Feb.1984). Thus, there is no particular stressor that triggers PTSD; it can be caused by any number of stressful experiences. The symptoms characteristic of PTSD may become apparent shortly after the traumatic event or they may not appear until several months, or even years later. [DSM-III at 237]. Moreover, determining from the symptoms that PTSD is the proper diagnosis ordinarily does not answer the question of what traumatic event caused it; the symptoms, in other words, are not reliable identifiers of the specific cause of the disorder.
... [I]n addition to triggering PTSD, the traumatic event may be the causative factor for a related, but different disorder. Child sexual abuse, a recognized stressor causing PTSD, may also be the triggering event for child sexual abuse accommodation syndrome (CSAAS). See Roland C. Summit, The Child Sexual Abuse Accomodation Syndrome, 7 Child Abuse & Neglect 177 (1983). For diagnostic purposes, characteristics commonly observed in sexually abused children, different from and in addition to those normally associated with PTSD, come into play. They are: (1) secrecy, (2) helplessness, (3) entrapment and accommodation, (4) delayed, conflicted, and unconvincing disclosure, and (5) retraction. Notwithstanding that CSAAS is not simply a refinement of PTSD on the basis of its cause, because when the traumatic event is child sexual abuse, they share a common cause, the approach to discovering that cause is analytically the same. And, because a diagnosis of PTSD is certainly more general than a diagnosis of CSAAS, the reliability of expert PTSD testimony on causation can be no greater than that concerning CSAAS.
The literature on the subject discusses PTSD and related disorders and syndromes in the context of treating victims of a traumatic experience. See, e.g., Woodling & Kossoris, Sexual Misuse: Rape, Molestation, and Incest, 28 Pediatric Clinics N.Am. 489, 489-490 (1981); Burgess & Holstrom, Rape: Victims of Crisis, 47-50 (1974); Comment, The Psychologist as Expert Witness: Science in the Courtroom?, 38 Md.L.Rev. 539, 580 n. 207 (1979). The literature concludes that a PTSD diagnosis is essentially a therapeutic aid, rather than a tool for the detection of sexual abuse, see State v. J.Q., 130 N.J. 554, 617 A.2d 1196, 1203-05 (1993); People v. Bledsoe, 36 Cal.3d 236, 203 Cal.Rptr., 450, 459, 681 P.2d 291, 300 (1984); John E.B. Myers, Expert Testimony in Child Sexual Abuse Litigation, 68 Neb.L.Rev. 1, 67-68 (1989); Comment, The Psychologist as Expert Witness: Science in the Courtroom?, supra at 580 n. 207 (Stating that the purpose of codifying the diagnostic criteria for PTSD is to "standardiz[e] the classification system with reference to empirically demonstrable phenomenon, thus enhancing the communication and research between mental health professionals."), since such a diagnosis *707 assumes the presence of abuse and explains the victim's reactions to it. (Citations omitted).
Because causes other than sexual abuse may trigger PTSDthe traumatic event being unable to be verified objectively, its occurrence must necessarily be assumeda diagnosis of PTSD does not reliably prove the nature of the stressor. Hutton, 663 A.2d at 1294-1295.
We are concerned about the use of PTSD evidence as substantive evidence that sexual abuse has occurred, when such evidence is not limited to explaining "superficially bizarre" reactions common to victims of child sexual abuse but which are uncommon to the experience of jurors. First, the psychiatric procedures used in developing the diagnosis of PTSD are designed for therapeutic purposes and are not reliable as fact-finding tools to determine whether sexual abuse has in fact occurred. See Hall, 412 S.E.2d at 889. And secondly, the potential for prejudice looms large because the jury may accord too much weight to expert opinions stating medical conclusions which were drawn from diagnostic methods having limited merit as fact-finding devices. Id.[14]
Although PTSD is widely accepted among professionals as an anxiety disorder attributable to some type of trauma, it has not been proven to be a reliable indicator that sexual abuse is the trauma underlying the disorder or that sexual abuse has even occurred. The principal diagnostic criteria for PTSD "include[s] persistent reexperiencing of the traumatic event ... persistent avoidance of stimuli associated with the trauma and numbing of general responsiveness...." DSM-IV at 463. The diagnostic criteria for PTSD are thus not intended to provide clinical or forensic tools for determining whether child sexual abuse has occurred but for dealing with the aftermath of severe traumatic events that have occurred in a variety of contexts.
The DSM-IV adds the following general observation: "[n]onclinical decision makers should also be cautioned that a diagnosis does not carry any necessary implications regarding the causes of the individual's mental disorder or its associated impairments...." DSM-IV at xxxiii. The psychiatric diagnosis of PTSD was not designed to determine sexual abuse, and the threshold criteria for the diagnosis of PTSD are not specific to child sexual abuse. Askowitz, at 2098. Furthermore, there are a variety of stressors in a child's life that can produce PTSD-type symptoms, and there is no baseline data about the presence of PTSD-type symptoms in nonabused and otherwise nonstressed children. Id. In short, there is not a sufficient consensus within the mental health community that there are certain behavioral symptoms that can lead a mental health professional to a conclusion of "consistent with child sexual abuse." Id.
Limited Admissibility of PTSD
In Foret, we concluded that evidence of Child Sexual Abuse Accommodation Syndrome (CSAAS) is of highly questionable scientific validity and fails *708 to unequivocally pass the Daubert threshold test of reliability. Foret, 628 So.2d at 1127. Similarly, because we find that a diagnosis of PTSD is certainly more general than a diagnosis of CSAAS, the reliability of expert PTSD testimony on causation can be no greater than that concerning CSAAS. Hutton, 663 A.2d at 1294. If the reliability of expert PTSD testimony on causation can be no greater than testimony of CSAAS as substantive proof that abuse occurred, we find expert testimony of PTSD is inadmissible for the purpose of substantively proving that sexual abuse occurred.
We come to this conclusion because the jury is asked to make the connection between a diagnosis of PTSD and the stressor, child sexual abuse, that is alleged to have caused it. Identification of the stressor is an important component of the PTSD diagnosis. But it is widely accepted that PTSD has not been proven to be a reliable indicator that sexual abuse is the trauma underlying the disorder or that sexual abuse has even occurred. The psychiatric diagnosis of PTSD was not designed to determine sexual abuse, Askowitz, at 2098, and the psychological evaluation of a child suspected of being sexually abused is, at best, an inexact science. Cressey, 628 A.2d at 699. For these reasons, we find that admission of expert testimony of a diagnosis of PTSD for the purpose of substantively proving sexual abuse fails to pass the Daubert threshold test of scientific reliability.
Just as we determined in Foret, expert testimony of general characteristics that would explain delays in reporting, recantations, and omissions of details is admissible. In the matter before us, there was no evidence in the record that A.C. or A.L. recanted their allegations. Nor were they young children who were cognitively unable to testify coherently or incapable of providing details. We find Ms. Ring's expert testimony went beyond the limited purpose of explaining the superficially bizarre behavior of a victim of child sexual abuse. We further find Ms. Ring's testimony deprived defendant of a fair trial by imbuing the girls' testimony with an undeserved scientific aura of truth. This testimony impermissibly bolstered the testimony of both girls. There was absolutely no indication that this testimony was necessary to explain to the jury the significance of a child-witness's demeanor, inconsistent reports, reluctance to testify or recantation. Although the defense showed there had been a slight delay between the date of the incidents and the reporting to the police,[15] expert testimony that Ms. Ring diagnosed A.C. with PTSD did not reliably explain why many sexually abused children delay reporting their abuse.[16]

CONCLUSION
Under these circumstances, we find that the State introduced the expert testimony regarding A.C.'s diagnosis of PTSD for the purpose of substantively proving that sexual abuse occurred. There is no *709 indication that the State attempted to limit this evidence to explain delayed reporting, which could be construed as apparently inconsistent with having been sexually abused. There is no showing that PTSD evidence is reliable and accurate as substantive proof of sexual abuse and therefore, it is inadmissible for this purpose. We hold that this evidence, like CSAAS-based evidence, should be admissible only for the limited purpose of explaining, in general terms, certain reactions of a child to abuse that would be used to attack the victim/witness's credibility. Foret, 628 So.2d at 1131. The trial court in its discretion can determine, on a case by case basis, if a particularized hearing is necessary (Daubert hearing) to test the reliability of expert testimony on PTSD when it is being offered for the limited purposes discussed above.

DECREE
For the foregoing reasons, the ruling of the appellate court is affirmed. This case is remanded to the district court for a new trial consistent with the views expressed herein.
AFFIRMED.
WEIMER, J., dissents and assigns reasons.
WEIMER, Justice, dissenting.
I respectfully dissent from the majority's opinion in this matter.
The expert, Ms. Ring, testified that she had diagnosed the alleged victim as having suffered from Post Traumatic Stress Disorder ("PTSD"). However, heeding the cautionary note sounded in the fourth edition of the Diagnostic and Statistical Manual of Mental Disorders about the forensic use of the various mental disorders catalogued and classified by the American Psychiatric Association therein, at no time did the witness testify that the PTSD was a result of sexual abuse. Because PTSD is a scientifically recognized and credible condition catalogued in the aforementioned reference guide, often used by courts, there is no doubt that the trial judge was capable of determining the admissibility of the expert's testimony as to PTSD without a separate particularized showing, and without abandoning his gatekeeping function.
Ms. Ring was not assessing the truthfulness or credibility of the victim. Rather, her assessment was that, based on the physical anxiety and flat effect the victim displayed, her symptoms were that of PTSD. Even though sexual abuse victims often suffer from PTSD, it is error to attribute that as a conclusion of Ms. Ring, because her findings were strictly objective and expressed in a manner that avoided commenting directly on the credibility of the victim and the cause of the symptoms displayed by the victim. As a result, the trial court did not err in admitting the testimony of this witness.
NOTES
[1] 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).
[2] 628 So.2d 1116 (La.1993).
[3] This opinion will refer to the minors by their initials, to protect their identities. La. Sup.Ct. Rule XXXII, § 3.
[4] A.C.'s date of birth is March 27, 1984.
[5] A.L.'s date of birth is September 24, 1984.
[6] Ms. Ring has a Bachelor's degree in psychology, a Master's degree in social work, and has worked in the field of social work, including internships, for seven years.
[7] Q. Just from A.C.'s standpoint, what symptomatology did you see that led you to conclude that diagnosis [PTSD] for her?

A. Primarily, what I sawwell, there was a lot of symptoms that she was manifesting throughout her therapy, both with myself and another counselor. Generally, she was very flat in her affect.
* * *
Q. What other things did you see that clinically were significant to you in regard to symptoms?
A. A lot of frustration. That's very common too....
* * *
A. A lot of fear; a lot of anxiety, you know. A lot of times persons also with post-traumatic stress find it very difficult to trust.
* * *
A .... they're very shut down, not very open to how they are feeling or what's going on inside of their head. That was another thing that definitely she exhibited that.
[8] In Kumho Tire, the United States Supreme Court held that Daubert's general holding setting forth the trial judge's general `gatekeeping' obligationapplies not only to testimony based on `scientific' knowledge, but also to testimony based on `technical' and `other specialized' knowledge. 526 U.S. at 147-148, 119 S.Ct. at 1174. The Court reiterated that a trial court should consider the specific factors identified in Daubert where they are reasonable measures of the reliability of expert testimony; those factors were meant to be helpful, not definitive. 526 U.S. at 151-152, 119 S.Ct. at 1175-1176.
[9] The State additionally argues that should we determine that the court of appeal was correct in finding Ms. Ring's testimony was erroneously admitted, this testimony only affected count one regarding A.C. The State urges the conviction on count two, involving A.L., should be reinstated. For reasons given in the body of the opinion, we affirm the court of appeal in full.
[10] The American Psychiatric Association characterizes PTSD as having the following diagnostic criteria:

A. The person has been exposed to a traumatic event in which both the following were present:
(1) the person experienced, witnessed, or was confronted with an event or events that involved actual or threatened death or serious injury, or a threat to the physical integrity of self or others
(2) the person's response involved intense fear, helplessness, or horror....
B. The traumatic event is persistently reexperienced in one (or more) of the following ways:
(1) recurrent and intrusive distressing recollections of the event....
(2) recurrent distressing dreams of the event....
(3) acting or feeling as if the traumatic event were recurring....
(4) intense psychological distress at exposure to internal or external cues that symbolize or resemble an aspect of the traumatic event.
C. Persistent avoidance of stimuli associated with the trauma and numbing of general responsiveness (not present before the trauma), as indicated by three (or more) of the following:
(1) efforts to avoid thoughts, feelings, or conversations associated with the trauma
(2) efforts to avoid activities, places, or people that arouse recollections of the trauma
(3) inability to recall an important aspect of the trauma
(4) markedly diminished interest or participation in significant events
(5) feeling of detachment or estrangement from others
(6) restricted range of affect ...
(7) sense of foreshortened future ...
D. Persistent symptoms of increased arousal (not present before the trauma) as indicated by two (or more) of the following:
(1) difficulty falling or staying asleep
(2) irritability or outbursts of anger
(3) difficulty concentrating
(4) hypervigilance
(5)exaggerated startle response
E. Duration of disturbance (symptoms in Criteria B, C, and D) is more than 1 month.
F. The disturbance causes clinically significant distress or impairment in social, occupational, or other important areas of functioning. DSM IV 427-429.
[11] See State v. Moran, 151 Ariz. 378, 382, 728 P.2d 248, 252 (1986); People v. Fasy, 829 P.2d 1314, 1317 (Colo.1992); State v. Batangan, 71 Haw. 552, 799 P.2d 48, 52 (1990); Commonwealth v. Hudson, 417 Mass. 536, 631 N.E.2d 50, 54 (1994); People v. Beckley, 434 Mich. 691, 456 N.W.2d 391, 399 (1990); Smith v. State, 100 Nev. 570, 688 P.2d 326, 327 (1984); State v. Hall, 330 N.C. 808, 412 S.E.2d 883, 890 (1992); State v. Bachman, 446 N.W.2d 271, 277 (S.D.1989); State v. Catsam, 148 Vt. 366, 534 A.2d 184, 187 (1987).
[12] See State v. Alberico, 116 N.M. 156, 861 P.2d 192, 210 (1993); Townsend v. State, 103 Nev. 113, 734 P.2d 705, 708 (1987); State v. Florczak, 76 Wash.App. 55, 882 P.2d 199, 210 (1994), review denied, 126 Wash.2d 1010, 892 P.2d 1089 (1995).
[13] See State v. Moran, 728 P.2d at 255; State v. Batangan, 799 P.2d at 52; People v. Beckley, 456 N.W.2d at 405; State v. Cressey, 137 N.H. 402, 628 A.2d 696 (1993) (expert's testimony regarding effects of sexual abuse on children not sufficiently reliable to be admitted as evidence that victims were sexually abused); State v. Hall, 412 S.E.2d at 890 (noting that evidence of PTSD "does not alone prove that sexual abuse has in fact occurred").
[14] In Hall, the court found that where PTSD evidence is admitted to prove sexual abuse has occurred, "the potential for prejudice against the defendant looms large because of that aura of special reliability and trustworthiness often surrounding scientific or medical evidence." Hall, 412 S.E.2d at 890. Therefore, the court concluded that evidence that a prosecuting witness is suffering from PTSD should not be admitted for the substantive purpose of proving sexual abuse occurred. Id. Such evidence would be allowed for certain corroborative purposes where the relevance to certain disputed issues had been shown by the prosecution. Id.
[15] Detective Dawn Gautreaux of the Sheriff's Office testified on cross-examination that they received a report on July 26, 1999, approximately 36 days after the incident. Detective Ashli Richardson of the Houma Police Department testified on cross-examination that four days passed between the date of the incident and the date it was reported.
[16] In a conference with the judge outside the presence of the jury, regarding the defense's objection to Ms. Ring testifying, the prosecutor stated the purpose of Ms. Ring's testimony was to show clinical symptoms consistent with sexual abuse. In his direct examination of Ms. Ring, the prosecutor asked if A.C.'s symptoms "were those consistent with a child who had been sexually abused."